## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

-----------------------------------------------------------

H3 ENTERPRISES, INC.,

        Plaintiff,

v.

BENJAMIN CHAVIS, LEON ELLIS, and
JOSEPH FLEMING,

        Defendants.

-----------------------------------------------------------

8:08 CV 2013-T26 TGW

CASE NO.

## COMPLAINT AND REQUEST FOR INJUNCTIVE RELIEF
### Parties; Jurisdiction; Venue

1.      Plaintiff H3 Enterprises, Inc. ("H3" or "Company") is a Florida corporation with its principal place of business at 433 Plaza Real, Suite #275, Boca Raton, Florida 33432.

2.      H3 owns and operates a franchisable HipHop Soda Shop restaurant in Tampa, Florida, which restaurant is a unique blend of restaurant, internet gaming facility, recording studio and merchandise purveyor, aimed at the Hip Hop generation demographic.

3.      H3 is a publicly traded company, listed on the Pink Quote electronic over the counter market system, commonly referred to as the "Pink Sheets."

4.      Defendant Benjamin Chavis ("Chavis") was retained by H3 to act as and did act as its President and Chief Executive Officer, overseeing H3's business in Florida until his termination by H3 on July 18, 2008.

5.      Upon information and belief, Chavis is a resident of the State of New York.



1

6.      Defendant Chavis is subject to the long arm jurisdiction of this Court pursuant to § 48.193, Florida Statutes (2008) by: (i) operating, conducting, engaging in, or carrying on a business or business venture in this state, and (ii) committing a tortious act within this state.

7.      During a portion of the period pertinent to this action, Defendant Leon Ellis ("Ellis") had been retained by H3 to and did oversee the building of its St. Petersburg restaurant (which did not open) and to oversee the opening and operations of new HipHop Soda Shops in Tampa and Miami, Florida.

8.      H3 had entered into discussions with Defendant Ellis to become its Vice President and Chief of Operations, but withdrew its offer and terminated his services. After termination, Defendant Ellis continued to represent himself within the State of Florida as an executive of H3.

9.      Upon information and belief, Defendant Ellis is a resident of the State of New York.

10.     Defendant Ellis is subject to the long arm jurisdiction of this Court pursuant to § 48.193, Florida Statutes (2008) by: (i) operating, conducting, engaging in, or carrying on a business or business venture in this state, and (ii) committing a tortiuous act within this state.

11.     Defendant Joseph Fleming ("Fleming") is an attorney with offices in New York, NY. Upon information and belief, Defendant Fleming is a resident of the State of New Jersey.

12.     During the period pertinent to this Complaint, Defendant Fleming was initially retained by H3 to and did perform legal services on behalf of the Company and specifically, in connection with its Florida properties and business operations, based on Fleming's representations that he was authorized to provide those services in Florida and in connection with

2

H3's Florida properties in St. Petersburg (now defunct), Tampa and Miami. Fleming traveled to Florida and conducted meetings with H3 business partners during his trips to the state.

13.     Later, after Defendant Fleming was informed that he would not be retained as Vice President and General Counsel for H3, Defendant Fleming continued to represent himself to the public, and specifically, in Tampa and Miami, as a member of H3's executive team.

14.     Defendant Fleming is subject to the long arm jurisdiction of this Court pursuant to § 48.193, Florida Statutes (2008) by: (i) operating, conducting, engaging in, or carrying on a business or business venture in this state, and (ii) committing a tortiuous act within this state.

15.     As set forth more fully below, each of the Defendants jointly and severally engaged in a series of improper actions which were intended to, and did, cause substantial and continuing harm to H3 and its shareholders, and continues to engage in harmful actions. H3 has suffered damages in an amount to be determined at trial but well in excess of $75,000. H3's damages are continuing.

16.     The Court has jurisdiction over this action under 28 U.S.C. §1332 in that there is complete diversity between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

17.     Venue is proper in this judicial district under 28 U.S.C. §1391(a)(2) in that a substantial part of the plaintiff's property is located in this judicial district and a substantial portion of the events and omissions complained of occurred in this judicial district.

**Background; Chronology**

18.     In or around June 2007, the H3 Board of Directors ("Board") entered into discussions with Chavis to act as H3's Chief Executive Officer.

3

19.     Chavis insisted that H3 retain as well two of his friends, Defendants Ellis and Fleming, and represented to the Board that Ellis had extensive and successful experience in franchising and operating restaurants, and that Fleming had extensive and relevant legal expertise.

20.     Rather than retaining each of the Defendants individually, the Board was presented with a consulting agreement to hire CEF Management, LLC ("CEF"), to provide management, operations and legal services to the Company. CEF consisted of Defendants Chavis, Ellis and Fleming. It was agreed that Dr. Chavis would be appointed as Chief Executive Officer, and soon thereafter, Dr. Chavis was named President as well.

21.     The Board soon recognized that the Company could not be operated successfully or properly under the aegis of CEF.

22.     Among other problems, the Board found that there were conflicts of interest between the Defendants and H3, whereby Defendants were incentivized to seek benefits for CEF to the detriment of the Company, and in fact appeared to be doing so.

23.     In or around November of 2007, the Board informed Defendants that this situation could not continue and Defendants and CEF entered into a written agreement formally terminating the CEF consulting agreement with H3.

24.     Defendant Chavis, together with Defendants Ellis and Fleming, represented to the Board that, were the Board to retain their services individually (rather than as CEF consultants), they could fulfill the managerial roles envisioned for them without engaging in any of the conflictive and counter-productive conduct that had suffused the CEF tenure.

25.     The Board, relying on these representations, agreed. In exchange for the compensation offered by the Board, Chavis agreed to remain the President and Chief Executive

Officer of the Company, Fleming agreed to act as its counsel, and Ellis agreed to act in a consultant capacity as the Company's operational manager. The parties agreed that Defendants would assume these positions immediately while H3 drafted the agreements formalizing the terms of the job offers. The Board presented each Defendant with a written contract memorializing the terms of each Defendant's retention by the Company in November 2007

26.      The Board's offers to Fleming and Ellis were based on the continued representations of Defendants that each of them was experienced and capable of performing these important executive roles, which representations were false.

27.      Moreover, the Board relied on the assurances of each Defendant that he would give his undivided loyalty to the Company, report to, and follow the directions of the Board, and refrain from any actions that would have even the appearance of self-dealing. Defendants' assurances were knowingly false when made.

28.      Although the Board promptly presented each Defendant in November 2007 with a written contract to detail his job responsibilities and compensation consistent with the oral offer of employment made to each Defendant, none of the Defendants signed his contract.

29.      Instead, once the Company publicly announced Defendants' positions with H3, Defendants, acting as a single bargaining unit, commenced a campaign to force the Company to compensate Defendants with cash and stock well in excess of the Company's agreement with Defendants and well in excess of what is standard and rational for a growth-stage Company.

30.      The Board made clear to Defendants that any work performed by them on H3's behalf would be subject to the oral agreement as memorialized in the November 2007 draft contracts.

31.     Defendants continued to maintain their positions at the Company under those terms, while devoting substantial effort to pressure the Company through both its Board members and the public to increase each Defendant's compensation.

32.     Thus, Defendant Chavis, with the help of Defendants Fleming and Ellis, repeatedly held webcasts, open to any H3 shareholder, in which he asked shareholders to lobby the Board to increase Defendants' compensation in order to 'save' the Company.

33.     Defendants threatened to falsely accuse Board members of misconduct unless their compensation was increased.

34.     Defendants randomly refused to complete time-sensitive assignments, as a warning to the Board to capitulate to their demands.

35.     Finally, in February 2008, after repeated good faith efforts to salvage the Company's relationship with Defendants and focus Defendants' attentions on their jobs, the Board determined that the retention of Defendants, except for Defendant Chavis, in their positions was detrimental to the Company.

36.     The Board determined that there was value to the Company in maintaining consistency in the office of President and provided Defendant Chavis with a revised employment agreement, at the same agreed-upon salary, but with incentive bonuses.

37.     The Board formally withdrew the contract provided to Defendant Ellis in November 2007 to serve as H3's full-time consultant, and offered him instead an 'as-needed' consultant agreement, with compensation to be paid for those weeks worked by Ellis.

38.     The Board formally withdrew the contract provided to Defendant Fleming in November 2007 to serve as H3's counsel and determined that Fleming would work on behalf of

the Company only as-needed, on an hourly fee basis, subject to Fleming providing the Board with a retainer agreement and fee schedule acceptable to it.

39.     Defendant Chavis did not sign the February 2008 employment agreement but continued as H3's CEO and President until his termination on July 18, 2008.

40.     Throughout that period, the Board repeatedly made clear that his services were being provided under the terms and conditions of the November 2007 employment contract.

41.     Defendant Ellis did not sign the February 2008 consultant agreement. On April 9, 2008, the Board formally withdrew its offer and reiterated that the Company's relationship with Defendant Ellis had been terminated.

42.     Defendant Fleming did not provide the Company with a retainer agreement for its review and acceptance and the Board did not request or approve Fleming's performance of any work after mid-February 2008. At the April 9, 2008 meeting of the Board, the Board reiterated that Defendant Fleming had not been, and was not authorized to perform any work on behalf of the Company.

43.     Nonetheless, despite the Board's directives in February and April 2008 (which were reiterated several times), Defendant Chavis continued to provide Defendants Ellis and Fleming with inside confidential Company information and to include Defendants Ellis and Fleming on internal Company correspondence.

44.     Despite having been terminated, Defendants Ellis and Fleming each continued to represent themselves as executives of the Company, and have sought compensation from the Company through June 2008. Defendants have made public appeals to pressure the Board to renege on its decisions and agree to retain Ellis and Fleming, and to pay all three Defendants additional and excessive compensation.

### Defendants' Conflicts of Interest and Self Dealing Continue

45.        Defendants engaged in activities placing them in a conflict of interest situation with Plaintiff and engaged in self dealing.

46.        For example, Defendants purported to locate H3 offices in the office space of Defendant Fleming, paying his rent, his office expenses, and hiring Fleming's law office staff (including Fleming's wife, Temple-Jene Fleming) to (allegedly) perform H3 work.   This continued for months, despite the Board's vociferous objections.

47.        Defendants further took control of the H3 bank account and its accounting records, and repeatedly refused – and continue to deny -- the Board access to the bank account, financial records, and executed H3 corporate debt instruments, as well as H3 trademark applications, business correspondence, employment records and other work product.

48.        Defendants used H3 funds for unauthorized expenses on their own behalf and on behalf of their colleagues, and have refused to account for such expenses or to reimburse the Company.

49.        Defendants initiated a series of communications with the public, via webcasts and other media, in which Defendant Chavis disclosed material non-public information about the Company, perhaps in an attempt to move the stock price.

50.        In addition, in his webcasts (which continued to be conducted over the objections of the Board), Chavis denigrated the Board, publicly bemoaned the Board's attempts to fire Ellis and Fleming, and, as a way to ensure his tenure with the Company, attempted to create a cult of personality whereby the investing public as well as potential H3 business partners would closely associate H3 -- and any potential for its success -- with Defendant Chavis.

51.     Among other acts of misconduct, Defendants, through their spokesperson Defendant Chavis, publicly announced in March 2008 various Company strategic initiatives, but threatened that "We will follow through with the following [franchises and strategic initiatives] *if* the Board of Directors recognizes the value of continuing with the Executive Management Team."

52.     Whenever the Board became aware of such activities, it immediately took steps to force Defendants to behave appropriately.

53.     The Board met on many occasions in both regular and emergency session, and passed a series of resolutions, directing Defendants to withdraw or refrain from certain of their activities which were contrary to the interests of the Company and the directives of the Board.

54.     Incredibly, Defendants chose to simply disobey the Board's resolutions.

55.     Defendant Chavis repeatedly ignored the Board's resolutions, stating that he had been advised by H3's then-lawyer, Defendant Fleming, that the executive team was not bound by the Board's resolutions.

56.     Fleming ignored Board resolutions (as well as the Company's by-laws and Florida corporate law), and advised Chavis to do the same, based on a variety of rationales, each one more ludicrous than the other.

57.     Defendant Fleming, in his role as H3's counsel, offered this skewed guidance to Defendant Chavis even where the Board resolutions related directly to Fleming. Thus, Fleming opined on the invalidity of Board resolutions relating to Fleming's continued tenure with the Company, his compensation, payment of his rent and employment of his family members.

58.     Fleming further took it upon himself to act as counsel to Defendants Ellis and Chavis, editing their proposed employment agreements and representing himself as acting on Ellis' and Chavis' behalves in their contract negotiations with his employer.

59.     Defendant Chavis, then-Chief Executive Officer of H3, made clear to the Board that he would not abide any Board directive that was inimical to the interests of himself or his friends, Defendants Ellis and Fleming.

60.     When presented with any conflict of interest between serving the best interests of the Company and loyalty to his cohorts, Chavis was clear that his friendships were paramount. Thus, Defendant Chavis refused to negotiate the employment agreements or, later, settlement agreements, presented to Fleming and Ellis as directed by the Board, instead insisting that the Board accept each and every one of the Defendants' ever-increasing demands.

61.     Indeed, even after Fleming's and Ellis' services were terminated by H3, Chavis copied Fleming and Ellis on confidential communications with the Board, stating that his friends were entitled to know everything.

62.     In addition, Defendant Chavis purposefully and repeatedly ignored the many Board resolutions which made clear that Defendant Ellis was not a Company Vice President or its Chief Operations Officer.   Ellis traveled to H3 events and held himself out to be the Company's Vice President although he had written notice of the Board resolutions terminating his relationship with the Company.  Defendant Chavis invited Ellis on these travels, arranged for the reimbursement of Ellis' expenses from the H3 bank account controlled by Temple-Jene Fleming from Defendant Fleming's office, and introduced Ellis as a Vice President and Chief Operations Officer of H3.

63.     Similarly, Defendants intentionally and repeated ignored the Board resolutions to sever the Company's relations with Fleming.  Defendant Fleming continued to hold himself out as a Vice President and General Counsel of H3 after his termination by the Board.

64.     Defendant Chavis, as President and C.E.O. of the Company, failed to negotiate with Ellis and Fleming on H3's behalf and in its interest, but instead attempted to negotiate with H3 on his cohorts' behalves, to the point of withholding his own performance in order to force the Board to acquiesce to Ellis' and Flemings' exorbitant demands.

65.     In July 2008, for example, Chavis failed to appear at an important business meeting in Miami relating to H3's Miami HipHop Soda Shop, though he did assure the Board he would do so and accepted funds explicitly for this purpose prior to the event to charge the Company for the expense of his plane ticket, lodging, and travel expenses.

66.     Chavis was open about the fact that his non-appearance – which was embarrassing to the Company and delayed a major transaction with an important partner – was due to the Board's continued refusal to allow Defendant Ellis to remain on the H3 payroll and fly down with Chavis to Miami at H3's expense.

67.     For months, and continuing to the present, Defendants retained material H3 corporate documents and financial records at Defendant Fleming's office and have refused to provide them to the Company.

68.     Most recently, counsel for H3 repeatedly requested from Defendant Fleming a copy of the signed note and security agreement relating to a default by a subtenant and borrower of H3, in connection with H3's Tampa business operations.

69.     H3 has no access to these signed instruments as Defendant Fleming did not provide H3 with a copy at the time, and despite the fact that H3 has or is in the process of

commencing litigation in Tampa on the note and security agreement, Fleming has ignored all requests made of him to furnish these documents.

### Defendants Misuse Company Funds

70.     The Defendants conspired together to use Company funds and resources for their own purposes.

71.     Defendants kept physical control over the Company's books and records, preventing the Board, and its appointed agents, such as its Chief Financial Officer, from gaining a full understanding of H3's finances and expenditures.

72.     Defendants still retain a large portion of the Company's financial records, and the harm to H3 is ongoing.

73.     Among other improper acts, Defendants frequently made expenditures in excess of $2,500.00 although the approval of the Chairman of the Board was required on any such expenditure. Defendants did not properly account for their outlays.

74.     In addition, Defendants, acting without Board approval and contrary to Company procedures, granted "consulting" agreements or other temporary employment to their friends and paid reimbursed for unauthorized expenses.

75.     The Company has expended significant sums on outside accounting services to correct the erroneous records.

### Defendants Threaten the Members of the Board

76.     Despite the Board's efforts to hold Defendants to their repeated and renewed promises of appropriate conduct, none of Defendants were willing to easily let go of their cash cow and determined to engage in ever more improper behaviors to obtain monies.

77.     Defendants instituted a campaign of threatening the members of the Board personally, as well as the Company, in order to receive a pay-off.

78.     Defendants repeatedly told the Board that they were aware of wrongdoing by individual Board members and by H3, but would agree to keep quiet if their demands for continued employment and increased compensation were met.

79.     Defendant Chavis also threatened to broadcast baseless allegations of wrongdoing during webcasts he made open to shareholders (webcasts that were choreographed by Defendant Fleming and participated in by Defendant Ellis) unless the Board agreed to keep his Executive Management Team (i.e., Defendants) in place and amply compensated them – a ploy one Board member likened to an attempted "corporate stick-up".

80.     Defendants made public statements that members of the Board and H3 had committed improper actions, and that only the stewardship of the Company by Defendants would save the Company.

81.     These statements, which Defendants knew to be false, were made with the intention of intimidating the Board members to set aside the best interests of H3 and bow to Defendants' extortion.  This the Board members would not do

82.     Defendants further threatened the Board with litigation, stating that they would tie up the Company in court and devalue the stock price unless H3 acceded to their demands.

83.     Since the Board members personally own significant amounts of stock, Defendants intended their threats to coerce Board members to forego their fiduciary duties to protect the Company from Defendants' egregious compensation demands in order to safeguard their own financial interests.

## Defendants Continue Their Wrongful Actions Post-Termination

84.     After Defendant Chavis was fired and had acknowledged that he was no longer an officer of H3, he cloaked himself in the guise of H3's CEO and wrote checks from the Company's bank accounts to pay Fleming's office staff, including Mr. Fleming's wife.

85.     Defendants continued to access and use corporate funds after they had been terminated by the Company.

86.     Upon information and belief, Defendants falsely and knowingly represented themselves to third parties, including banks, as authorized agents of the Company after their authority had been terminated by the Company.

87.     Upon information and belief, Defendants have posted derogatory and false statements about H3 and its Board members on the Internet, including investor sites, sometimes using aliases.

88.     Defendant Fleming continues to withhold from H3 the books and records of the Company, preventing H3 from properly conducting the financial affairs of the Company. Fleming is holding the Company's most basic documents and information hostage to obtain a pay-off including, but not limited to, the executed corporate debt and security instruments needed to collect H3 receivables which is needed immediately in connection with pending litigation.

## Defendants Did Not Adequately Perform the Services for Which They Were Hired

89.     Defendants did not perform the services promised by them during the period of time that they were working for the Company.  As a consequence, the Company suffered, and continues to suffer, direct injury, as well as significant loss of reputation and loss of opportunity.

90.     Defendant Fleming simply did not perform many of the outstanding legal and managerial tasks he had agreed to undertake on behalf of the Company and did not meet professional standards in his dealing with many other issues.

91.     Among other wrongful acts, Fleming engaged repeatedly in acts of self-dealing, paying his family, office staff and rent from Company funds, and ignored clear conflicts of interest, providing legal advice to H3's CEO that was contrary to established law and intended only to benefit Fleming, his family, and his co-Defendants

92.     Defendant Ellis did not have the expertise to manage restaurant or franchise operations and failed to devote the time and attention required to establish and operate a professionally-run business.

93.     Among other breaches, Ellis failed to draft the Company's Operations Manual, one of his primary responsibilities. Ellis' failure to complete this task for months significantly delayed H3's ability to market franchises, resulting in the loss of significant business opportunities.

94.     Defendant Chavis was repeatedly urged to rectify the defaults of his colleagues and to take steps to make sure that the deliverables promised by Ellis and Fleming were completed, either by them or by replacements.

95.     Defendant Chavis was at all times aware of Defendants Fleming's and Ellis' failures to perform their jobs or complete their deliverables, and intentionally allowed them to avoid performance.

96.     In addition to Defendant Chavis' intentional failure to oversee his friends or the tasks assigned to them, and his willful disregard of the Board's resolutions, Defendant Chavis negligently and recklessly entered into various agreements to open a Miami Hip Hop Soda Shop.

97.      Specifically, Defendant Chavis without board authorization, publicly announced opening of the Miami location and committed the Company to over $500,000 in expenses, which it could not afford..

98.      Defendant Chavis also brought in a joint venture partner, again without board authorization and also did so without any investigation into the joint venture partner, its business dealings or its debts and obligations, which minimal investigation would have revealed that the joint venturer was in the midst of an eviction action at the very location in which the Miami store was to operate, resulting in significant losses to the Company.

99.      In or around February of 2008, Chavis repeatedly disclosed non-public information about the Company's business plans.

100.     Because of Chavis' importunate disclosure, the Board was forced to consider unattractive alternative financing vehicles to support Chavis' promise.  At this stage in the Company's growth, the only financing made available to it was at terms highly unfavorable to the Company and its shareholders.  As a consequence, the Board members were given little choice but provide their own funds as financing to enable the Company to fulfill the unauthorized financial obligations entered into by the Defendants.

101.     Defendant issued press releases and made public statements broadcast over the internet that included false information about Company affairs.

102.     Together with Defendant Fleming, Chavis missed filing Uniform Franchise Disclosure Document (formerly known as  U.F.O.C.), severely hindering H3's ability to sell franchises for the HipHop Soda Shop – its core business.

103.     Despite more than four resolutions of the Board and repeated directions from Board members, Defendant Chavis refused for more than 5 months (through the date of his

16

termination) to cease operating Company business from Defendant Fleming's New York City office.

104.     Defendant Chavis continued to share sensitive and proprietary Company information with Fleming and Ellis after those Defendants' relationship with H3 was terminated.

## COUNT I

### Breach of Fiduciary Duty – as to all Defendants

105.     Plaintiff repeats and realleges paragraphs 1-104 as if fully set forth herein.

106.     This is an action for breach of fiduciary duty.

107.     By virtue of their positions with H3 and their representations to the Company, each defendant owed fiduciary duties to H3, including duties of loyalty and fair dealing.

108.     Defendants each breached their respective fiduciary duty to Plaintiff.

109.     Plaintiff has suffered damages as a result of Defendants' breach of fiduciary duty.

WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, for damages, together with interest, costs, and such other relief as the Court deems proper.

## COUNT II

### Conversion– as to all Defendants

110.     Plaintiff repeats and realleges paragraphs 1-17, 46, 48, 70, 73-74, 84-86 as if fully set forth herein.

111.     This is an action for conversion.

112.     Defendants had access to H3's funds and property, including access to its bank account.

113.     Without authorization or justification, each Defendant took property in derogation of H3's ownership interest.

114.    Defendants have each refused to return H3's property or reimburse H3, despite demand.

WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, for damages, together with interest, costs, and such other relief as the Court deems proper.

## COUNT III

### Unjust Enrichment – as to all Defendants

115.    Plaintiff repeats and realleges paragraphs 1-17, 34, 36, 39, 44, 46, 48, 62, 65-66, 70, 73-74, 89-104 as if fully set forth herein.

116.    This is an action for unjust enrichment.

117.    Plaintiff conferred a benefit on Defendants, in that Plaintiff paid Defendants individually and as principals of CEF with cash and H3 stock (the "Benefits").

118.    Defendants appreciated the Benefits.

119.    Defendants retained the Benefits.

120.    Under the circumstances, Defendants' retention of the Benefits without paying the value thereof or providing the requisite services is therefore inequitable.

121.    Plaintiff has been injured thereby, and seeks disgorgement of these benefits by Defendants.

WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, for damages, together with interest, costs, and such other relief as this Court deems proper.

## COUNT IV

### Aiding and Abetting – as to each Defendant

122.    Plaintiff repeats and realleges paragraphs 1-17, 46, 48, 70, 73-74, 84-86 as if fully set forth herein.

123.     Each Defendant aided and abetted each of the other Defendants in the commission of conversion.

124.     Plaintiff has been damaged thereby, in an amount to be determined at trial.

WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, for damages, together with interest, costs, and such other relief as the Court deems proper.

## COUNT V

### Malpractice – as to Defendant Fleming

125.     Plaintiff repeats and realleges paragraphs 1-3, 11-17, 19, 26, 28-35, 38, 42, 44, 56-58, 63, 67-69, 88-91, 102, as if fully set forth herein.

126.     Plaintiff employed Defendant Fleming, an attorney, to represent Plaintiff in various matters.

127.     Defendant Fleming neglected his reasonable duty to Plaintiff.

128.     Defendant Fleming's negligence resulted in and was the proximate cause of damages and loss to Plaintiff.

WHEREFORE, Plaintiff demands judgment against Defendant Fleming for damages, together with interest, costs, and such other relief as the Court deems proper.

## COUNT VI

### Preliminary and Permanent Injunctive Relief– as to each Defendant

129.     Plaintiff repeats and realleges paragraph 1-25, 35-44, 47-51, 53-56, 59, 61-63, 67-72, 77-88, 97-101, 103-104 as if fully set forth herein.

130.     This is an action for preliminary and permanent injunctive relief.

131.     Plaintiff has a substantial likelihood of success on the merits against Defendants.

132.   Plaintiff will suffer irreparable injury unless this Court grants the injunctive relief requested herein.

133.   The threatened injury to the Plaintiff outweighs the harm an injunction may cause Defendants.

134.   The granting of the injunction will not cause harm to the public.

135.   Plaintiff has no adequate remedy at law.

136.   Specifically, Plaintiff seeks an Order of the Court enjoining each Defendant from (i) representing himself as an officer, employee or consultant of H3, (ii) contacting any business partner, employee, customer or vendor of H3 in connection with H3 or any members of its Board, and (iii) making any public statements about H3 or any member of its Board.

137.   Plaintiff also seeks an Order of the Court requiring the Defendants to return to Plaintiff all of the Company's original business records, including but not limited to those relating to bank accounts, accounting, finances, debt instruments, leases, subleases, employees, notes and security agreements held by the Company, contracts and agreements of any kind.

WHEREFORE, Plaintiff respectfully requests that this Court grant preliminary and permanent injunctive relief as requested herein, together with such other or further relief as the Court deems just and proper.

CAREY, O'MALLEY, WHITAKER & MUELLER, P.A.
712 S. Oregon Avenue
Tampa, Florida 33606
Ph: (813) 250-0577
Fax: (813)-250-9898
Attorneys for H3 Enterprises, Inc.

By: _____
E. Ashley McRae, Trial Counsel
Florida Bar No. 15737

20